## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**GUSTAVO ABDELNOUR,**

    **Plaintiff,**

**v.**                                    **CASE NO:**

**RATEMYAGENT, INC.**

    **Defendant.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, GUSTAVO ABDELNOUR, (hereinafter "Plaintiff" or "Mr. Abdelnour"), by and through the undersigned counsel, hereby sues Defendant, RATEMYAGENT, INC., (hereinafter "Defendant," "RateMyAgent," or "Company") and alleges:

## INTRODUCTION

1.     The Plaintiff brings this action against Defendant, his former employer, seeking to recover damages for unlawful discrimination based on disability, race, and national origin, and retaliation in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and its implementing Regulations.

2.     As further set forth below, Plaintiff alleges that Defendant unlawfully discriminated against him, altered the terms, conditions, and privileges of his employment because of his disability, race, and national origin, and retaliated against him in violation of his rights under the ADA and Title VII.

3.     As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered actual damages: loss of income, loss of opportunity for future income, loss of benefits, and loss of future pay increases. In addition, he has suffered and continues to suffer loss of his professional and personal reputation, emotional distress, mental anguish, embarrassment, and humiliation.

4.     Plaintiff has incurred costs and attorney's fees in bringing this matter.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5.

6.     This Court has jurisdiction to grant declaratory relief, declare the rights and legal relations of the parties, and order further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in the United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within this District and Division and pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices out of which Plaintiff's claims herein arise were committed within this District and Division. All facts and circumstances arising from this dispute took place in Hillsborough County, Florida.

## PARTIES

8.      Plaintiff is GUSTAVO ABDELNOUR, a 40-year-old male of Palestinian descent who was raised in Venezuela and learned English at approximately age fifteen, resulting in a Spanish accent. Plaintiff has been diagnosed with multiple disabilities, including morbid obesity (BMI 55), anxiety, depression, panic attacks, post-traumatic stress disorder ("PTSD"), binge eating disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"). Plaintiff takes prescribed medications, including Vyvanse, and is under ongoing psychiatric care. Plaintiff resides in Hillsborough County, Florida.

9.      Plaintiff is a member of a class protected against discrimination

and retaliation based on his disability, race, and national origin under the ADA and Title VII.

10.    At all times material herein, Plaintiff met the definitions of "employee" and "eligible employee" under all applicable federal and state statutes.

11.    At all times material herein, Plaintiff was an employee entitled to protection as defined by the ADA and Title VII.

12.    The Defendant, RATEMYAGENT, INC., is a Delaware corporation with its principal place of business located at Suite 100, 541 Jefferson Ave, Redwood City, CA 94063, and maintains additional business operations at 2110 S Coast Hwy Suite L, Oceanside, CA 92054.

13.    At all times material herein, Defendant is a digital marketing and reputation platform company for real estate agents that regularly conducted, and continues to conduct, business throughout the United States, including Florida, employing between 101-200 employees and operating as a publicly traded company listed on the Australian Securities Exchange.

14.    At all times material herein, Defendant employed Plaintiff remotely from his location in Hillsborough County, Florida, from November 4, 2024 through July 8, 2025, in the position of Account Executive/Sales

Associate.

15.    At all times material herein, Defendant met, and continues to meet, the definitions of "employer" under all applicable federal and state statutes including, but not limited to the ADA and Title VII.

16.    Accordingly, Defendant is liable under the ADA and Title VII for the unlawful discrimination and retaliation to which it subjected Plaintiff.

## ADMINISTRATIVE PREREQUISITES

17.    Plaintiff has properly exhausted all administrative prerequisites prior to filing the instant lawsuit.

18.    On September 16, 2025, Plaintiff timely dual filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") against Defendant alleging, among other things, disability discrimination, race discrimination, national origin discrimination, and retaliation.

19.    On September 24, 2025, the EEOC issued Plaintiff a Notice of Right to Sue in reference to his Charge of Discrimination (EEOC Charge No. 511-2025-05046) against Defendant.

20.    All conditions precedent to bringing this action have been

performed or have occurred.

## <u>GENERAL ALLEGATIONS</u>

21.    Mr. Abdelnour suffers from multiple qualifying disabilities under the Americans with Disabilities Act ("ADA"), including morbid obesity with a body mass index ("BMI") of approximately 55, anxiety, depression, panic attacks, post-traumatic stress disorder ("PTSD"), binge eating disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"). Due to these conditions, Mr. Abdelnour requires ongoing psychiatric treatment and takes prescribed medications, including Vyvanse for ADHD and other costly medications for his mental health conditions.

22.    Mr. Abdelnour's morbid obesity substantially limits one or more major life activities and requires specialized medical care, including preparation for bariatric surgery that involves several months of medically supervised treatment. His anxiety, depression, panic attacks, PTSD, and binge eating disorder significantly impair his ability to function in high-stress work environments and require continuous psychiatric care and medication management.

23.    Mr. Abdelnour is of Palestinian descent and was raised in Venezuela. He is a native Spanish speaker who learned English at

approximately age fifteen and speaks English with a Spanish accent. Mr. Abdelnour is bilingual and has more than ten years of professional sales experience, including real estate and account executive roles. Since at least 2010, he has been a top-performing account executive at multiple companies, consistently exceeding performance expectations. Over the course of his real estate career, he has generated more than $12 million in sales revenue.

24.    In 2022, Mr. Abdelnour began working for Defendant as a sales associate. During this employment, he was instructed to pass sales opportunities and active deals to Brit Brown, another Account Executive, and was prohibited from selling to teams or offices, materially limiting his ability to generate revenue. Defendant represented that Mr. Abdelnour was required to meet certain performance benchmarks during his probationary period, which he achieved by his sixth month of employment. Despite this performance—including being the second-highest sales performer in November 2022 and having two of his originated deals closed by Brit Brown—Mr. Abdelnour was terminated in November 2022 under the pretext of a "restructure."

25.    On October 17, 2024, Defendant offered Mr. Abdelnour a second opportunity for employment. Mr. Abdelnour executed an employment

agreement on October 21, 2024, to work as an Account Executive/Sales Associate, with a start date of November 4, 2024.

26.    Upon rehire, Mr. Abdelnour's employment contract provided for a base salary of $60,000 annually, commission eligibility, an annual ARR quota of $225,000, and health insurance benefits essential to his psychiatric treatment and prescribed medications. Prior to accepting reemployment, Mr. Abdelnour disclosed to Tenilly Humphrey that during his prior tenure he had been required to relinquish significant deals despite his ability to close them. He was assured there would be no limitations on the size or type of deals he could pursue. Contrary to those assurances, in or around November 2024, Defendant restricted Mr. Abdelnour to selling only to individual agents for a three-month period. During this time, he was repeatedly discouraged from pursuing larger deals and was told by Account Executive Brit Brown to "stay in [his] place." He was also subjected to inappropriate remarks regarding his manner of speaking, including comments about his "evil laugh," contributing to a hostile and demeaning work environment.

27.    From the outset of his second tenure, Mr. Abdelnour experienced differential treatment related to his national origin and accent.

Management discouraged him from speaking during meetings and suggested that customers had difficulty understanding him during calls, while similarly situated employees without accents were not subject to such criticism.

28.    Despite being bilingual and experienced in serving Spanish-speaking clients, Defendant denied Mr. Abdelnour requests to leverage his language skills, including refusing to provide Spanish-speaking customer service support and preventing him from pursuing major Hispanic brokerages and teams. Instead, Spanish-speaking opportunities were redirected to English-only employees.

29.    Throughout his employment beginning in November 2024, Mr. Abdelnour was restricted from pursuing larger sales opportunities—including boutique brokerages and teams—despite having greater tenure than other employees and repeatedly advocating for access. When he was granted limited approval to pursue larger opportunities during his final quarter, he exceeded expectations. By contrast, newer employees hired in or around May and June 2025, including individuals with prior ties to MoxiWorks, were immediately allowed to pursue large teams and brokerages. Anthony Snitsman and Brit Brown were given access to high-

value accounts and visibility despite having less tenure, even while Mr. Abdelnour was producing equal or greater results. Management commented favorably on Mr. Snitsman's voice during calls while subjecting Mr. Abdelnour to heightened monitoring and confinement to lower-tier opportunities.

30.    Throughout his employment, Mr. Abdelnour was excluded from high-value lead rotations and brokerage opportunities that were routinely provided to newer hires with personal or business connections to Defendant's leadership, particularly individuals associated with the MoxiWorks network.

31.    Mr. Abdelnour did not request time off as a disability accommodation. However, in October 2022, he requested previously approved vacation time for the Christmas holiday. During that period, he was grieving the loss of his dog, which temporarily impacted his performance. By mid-November 2022, he had exceeded his performance goals and was on track to meet or surpass his monthly targets. Nonetheless, on or about November 18, 2022, Defendant terminated his employment.

32.    Despite systemic obstacles, Mr. Abdelnour performed at an exceptional level, achieving approximately 135% of quota in May 2025 with

$20,597 in ARR and approximately 125% of quota in June 2025 with $18,750 in ARR.

33.    In April 2025, after Mr. Abdelnour raised concerns regarding lack of support and disparate treatment, Defendant placed him on probation and extended his probationary period through June 4, 2025.

34.    During probation, Mr. Abdelnour continued to excel, closing 111 deals in his final quarter and generating more than $47,000 in ARR, including setting a daily record of eight subscriptions on December 31, 2024.

35.    On June 3, 2025, Mr. Abdelnour completed Defendant's employee engagement survey and raised concerns regarding discriminatory treatment and unequal access to opportunities.

36.    Following the survey, Defendant subjected Mr. Abdelnour to increased micromanagement and scrutiny not applied to similarly situated employees outside his protected classes.

37.    Mr. Abdelnour proactively sought to expand Defendant's market presence. He organized and attended an eXp Realty Zoom event after completing extensive required training and advocating for inclusion in team rotations. Despite the success of the event, his manager, Steph Holtan, provided no recognition and discouraged him from pursuing follow-up

opportunities within his extensive eXp network. In December 2024, Mr. Abdelnour attended a La Rosa Realty event but was again discouraged from pursuing deeper engagement or expansion into Spanish-speaking brokerages. He was told that his role was limited to independent agents and that Defendant would not invest in Spanish-speaking customer support to facilitate growth.

38.    Defendant engaged in a pattern of misattributing Mr. Abdelnour's work to other departments or employees. Sales efforts involving two-way customer engagement were labeled "organic" and credited to Marketing. On June 30, 2025—after Mr. Abdelnour closed seven deals and was positioned as a top performer—an $18,000 Curated Social deal was credited to Anthony Snitsman, even though it was finalized by Steph Holtan and Tiana Baur while Mr. Snitsman was on vacation in Europe. This occurred the same day Defendant announced Kelly Muller and James McCalvy as Senior Account Executives, preventing Mr. Abdelnour from finishing the period as the leading performer.

39.    Mr. Abdelnour observed that employees from CEO Jim Crisera's former company, MoxiWorks, received preferential treatment, including senior titles upon hire, immediate access to tools, and superior lead

distributions.

40.    At termination, management—including Tiana Baur—stated
that favored employees had demonstrated "superior performance at
MoxiWorks," explicitly tying opportunity allocation to prior affiliations
rather than Mr. Abdelnour's actual results.

41.    When Mr. Abdelnour advocated for equal treatment, Defendant
characterized his concerns as performance issues and used them to justify
adverse actions.

42.    On July 8, 2025, just hours after Mr. Abdelnour successfully led
a HubSpot discovery session for new hires, Defendant terminated his
employment.

43.    Defendant claimed Mr. Abdelnour's position was eliminated
due to a restructure, but similarly situated employees were retained or
promoted.

44.    Defendant offered severance of approximately $3,308, which
was insufficient to maintain medical care.

45.    When Mr. Abdelnour requested a reasonable severance to
maintain COBRA coverage, Defendant refused and threatened to withdraw
the offer.

46.    Defendant terminated Mr. Abdelnour's health insurance effective July 31, 2025.

47.    As a result, Mr. Abdelnour suffered severe financial hardship, including taking a $2,700 high-interest loan from OPP Loans, falling behind on obligations, facing HOA and Capital One collection actions, and accepting lower-paying employment.

48.    Defendant's conduct exacerbated Mr. Abdelnour's mental health conditions and caused severe emotional distress.

49.    Mr. Abdelnour's termination was particularly egregious given his consistent overperformance.

50.    Although Defendant did not expressly state obesity as a reason for termination, it consistently favored physically fit employees for visibility and advancement while excluding Mr. Abdelnour.

51.    Defendant exhibited favoritism toward former MoxiWorks employees, including James McCalvy and Kelly Muller, who were hired into senior roles with full enablement.

52.    Kelly Muller, James McCalvy, Anthony Snitsman, and Brit Brown received senior titles, tools, and deal access denied to Mr. Abdelnour.

53.    Defendant improperly withheld approximately $2,150 in earned

commissions and failed to provide reconciliations, further minimizing Mr. Abdelnour's compensation.

54.    Defendant's discriminatory culture was reflected in Glassdoor reviews describing clique-based favoritism.

55.    Defendant's actions disrupted Mr. Abdelnour's medical treatment and bariatric surgery preparation.

56.    Loss of insurance jeopardized access to essential medications.

57.    Defendant refused even minimal severance accommodations.

58.    The timing of Mr. Abdelnour's termination shortly after protected complaints and commission objections establishes retaliation.

59.    Defendant's conduct caused ongoing emotional, financial, and medical harm.

60.    Mr. Abdelnour continues to mitigate damages while managing disabilities exacerbated by Defendant's discrimination.

### COUNT I
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### Disparate Treatment Disability Discrimination
### 42 U.S.C. §§ 12101-12213

61.    Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in paragraphs 1 through 60 as though fully set forth

herein.

62.    Plaintiff is an individual with a disability within the meaning of the ADA, including but not limited to morbid obesity (BMI approximately 55), ADHD, anxiety, depression, panic attacks, PTSD, and binge eating disorder.

63.    At all times material, Defendant employed Plaintiff and was an "employer" within the meaning of the ADA.

64.    Plaintiff was a qualified individual who could perform the essential functions of his position, with or without reasonable accommodation.

65.    Defendant subjected Plaintiff to adverse employment actions, including but not limited to restricting him from higher-value opportunities and visibility, placing him on probation, subjecting him to heightened scrutiny, terminating his employment, and cutting off his employer-provided health insurance.

66.    Defendant treated Plaintiff differently than similarly situated employees who were not disabled or were perceived as more physically fit, including by favoring such employees for visibility, advancement, and access to high-value sales opportunities and events while denying Plaintiff

comparable access despite Plaintiff's strong performance.

67.   Defendant's stated reasons for its adverse actions were pretextual, and Plaintiff's disability and/or perceived disability was a motivating factor in Defendant's decision-making.

68.   As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including lost wages and benefits, loss of earning capacity, and emotional distress, and is entitled to all remedies available under the ADA.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.   Grant judgment in favor of Plaintiff and declare that Defendant has violated the ADA. 42 U.S.C. § 12101 et seq., as amended, and its implementing Regulations, discriminating against Plaintiff based on his disabilities;

B.   Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the discrimination to which Defendant subjected him, including, but not limited to,

front pay in lieu of reinstatement, full backpay with interest, pension and related benefits, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C.  Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of his injuries and damages caused by Defendant's discriminatory conduct and actions pursuant to the ADA;

D.  Award Plaintiff all other damages available under the ADA, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under the ADA, according to proof;

E.  Award Plaintiff pre- and post-judgment interest calculated at the prevailing rate, as provided by law;

F.  Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.  Grant such other and further relief as this Court may deem equitable, just, and proper.

<u>COUNT II</u>
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### Failure to Provide Reasonable Accommodation  and Engage in
### Interactive Process
### 42 U.S.C. §§ 12101-12213

69.    Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in paragraphs 1 through 60 as though fully set forth herein.

70.    Plaintiff is an individual with a disability within the meaning of the ADA, including but not limited to ADHD and related psychiatric conditions, and Defendant was aware of Plaintiff's disability and/or need for disability-related support.

71.    Plaintiff was a qualified individual who could perform the essential functions of his position with reasonable accommodation.

72.    Plaintiff requested reasonable accommodations necessary to perform his job duties, including access to essential sales enablement and task-management functionality within HubSpot (including "tasks" features) to manage follow-ups and execution consistent with his ADHD-related limitations.

73.    Defendant failed to engage in a timely, good-faith interactive process to evaluate Plaintiff's accommodation needs and instead delayed,

denied, or provided inconsistent explanations for Plaintiff's requests, requiring Plaintiff to repeatedly advocate for basic functional access during performance meetings and reviews.

74.    Defendant's failure to provide necessary tools and to engage in the interactive process materially impaired Plaintiff's ability to perform his job and contributed to adverse employment actions, including heightened scrutiny, probationary treatment, and termination.

75.    As a direct and proximate result of Defendant's failure to accommodate and failure to engage in the interactive process, Plaintiff suffered damages including lost wages and benefits, diminished earning capacity, and emotional distress.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated the ADA. 42 U.S.C. § 12101 et seq., as amended, and its implementing Regulations, discriminating against Plaintiff based on his disabilities;

B.   Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the discrimination to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, pension and related benefits, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C.   Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of his injuries and damages caused by Defendant's discriminatory conduct and actions pursuant to the ADA;

D.   Award Plaintiff all other damages available under the ADA, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under the ADA, according to proof;

E.   Award Plaintiff pre- and post-judgment interest calculated at the prevailing rate, as provided by law;

F.   Award Plaintiff his attorneys' fees, reasonable expert witness

fees, and the costs of this action; and

G.    Grant such other and further relief as this Court may deem equitable, just, and proper.

## COUNT III
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### Hostile Work Environment Based on Disability
### 42 U.S.C. §§ 12101-12213

76.    Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in paragraphs 1 through 60 as though fully set forth herein.

77.    Plaintiff is an individual with a disability within the meaning of the ADA, including but not limited to morbid obesity and psychiatric disabilities.

78.    Defendant subjected Plaintiff to unwelcome harassment and demeaning treatment because of his disability and/or perceived disability, including repeated discouragement, disparate constraints on access to opportunities, and humiliating or derisive commentary and treatment by supervisors and coworkers.

79.    The harassment and differential treatment were sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's

employment and create an abusive working environment, and Plaintiff subjectively perceived the environment as hostile.

80.    Defendant knew or should have known of the harassment and discriminatory workplace conduct by supervisors and employees and failed to take prompt, appropriate remedial action.

81.    As a direct and proximate result of Defendant's hostile work environment, Plaintiff suffered damages including emotional distress, exacerbation of disability-related symptoms, and loss of employment-related opportunities and benefits.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated the ADA. 42 U.S.C. § 12101 et seq., as amended, and its implementing Regulations, discriminating against Plaintiff based on his disabilities;

B.    Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the discrimination

to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, pension and related benefits, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C.  Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of his injuries and damages caused by Defendant's discriminatory conduct and actions pursuant to the ADA;

D.  Award Plaintiff all other damages available under the ADA, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under the ADA, according to proof;

E.  Award Plaintiff pre- and post-judgment interest calculated at the prevailing rate, as provided by law;

F.  Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.  Grant such other and further relief as this Court may deem

equitable, just, and proper.

## COUNT IV
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### Discrimination in Fringe Benefits Because of Disability
### 42 U.S.C. §§ 12101-12213

82.     Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in paragraphs 1 through 60 as though fully set forth herein.

83.     Plaintiff is an individual with a disability within the meaning of the ADA, and Defendant was aware of Plaintiff's disability-related medical needs, including the need for continuous psychiatric care and prescribed medications, and medically supervised bariatric surgery preparation.

84.     Defendant provided Plaintiff health insurance benefits as a term and condition of employment, and those benefits were essential to Plaintiff's disability-related medical treatment.

85.     Defendant interfered with and discriminated against Plaintiff in the provision and continuation of fringe benefits by terminating Plaintiff's health insurance effective July 31, 2025 during severance negotiations and by refusing reasonable severance terms designed to maintain Plaintiff's coverage through COBRA, despite knowledge that coverage was medically

necessary.

86.    Defendant's actions regarding Plaintiff's benefits were taken because of Plaintiff's disability and/or perceived disability and were part of Defendant's broader discriminatory treatment and termination decision.

87.    As a direct and proximate result of Defendant's benefits interference and discrimination in fringe benefits, Plaintiff suffered damages including interruption of medically necessary care, inability to afford medications, exacerbation of disability-related symptoms, and additional economic losses.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated the ADA. 42 U.S.C. § 12101 et seq., as amended, and its implementing Regulations, discriminating against Plaintiff based on his disabilities;

B.    Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the discrimination

to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, pension and related benefits, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C.   Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of his injuries and damages caused by Defendant's discriminatory conduct and actions pursuant to the ADA;

D.   Award Plaintiff all other damages available under the ADA, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under the ADA, according to proof;

E.   Award Plaintiff pre- and post-judgment interest calculated at the prevailing rate, as provided by law;

F.   Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.   Grant such other and further relief as this Court may deem

equitable, just, and proper.

## COUNT V
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### Retaliation
### 42 U.S.C. §§ 12101-12213

88.    Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in each of the preceding Paragraphs 1 through 60 of this Complaint as though fully set forth herein.

89.    Plaintiff is a 40-year-old male who has been diagnosed with morbid obesity (BMI 55), anxiety, depression, panic attacks, post-traumatic stress disorder ("PTSD"), binge eating disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"), each of which constitutes a qualifying disability under the ADA.

90.    At all times material herein, Defendant employed Plaintiff and Defendant was an "employer" within the meaning of the ADA.

91.    Moreover, Defendant is a "person" within the meaning of the ADA, 42 U.S.C. § 12101 et seq.

92.    At all times material herein, Defendant employed Plaintiff.

93.    Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations for his disabilities, including access

to essential sales tools and task-management functionality within HubSpot to enable him to perform his job duties given his ADHD. Plaintiff also engaged in protected activity by objecting to discriminatory treatment, unequal access to opportunities, and improper calculation and delayed payment of his earned commissions.

94.    Plaintiff also engaged in protected activity by expressing concerns about discriminatory treatment in the June 3, 2025 employee engagement survey, where he voiced concerns about the differential treatment and lack of opportunities he was experiencing compared to his colleagues.

95.    Defendant subjected Plaintiff to adverse employment actions in retaliation for his protected activities, including placing him on probation in April 2025 shortly after Plaintiff raised concerns regarding discriminatory treatment, lack of support, and unequal access to opportunities.

96.    Following the June 2025 engagement survey where Plaintiff voiced concerns about discriminatory treatment, Defendant began micromanaging Plaintiff and subjecting him to increased scrutiny and different treatment compared to similarly situated employees who were not members of protected classes.

97.    Defendant ultimately terminated Plaintiff's employment on July 8, 2025, just hours after he had successfully facilitated a HubSpot discovery session with new hires, demonstrating that his termination was in retaliation for his protected activities rather than for legitimate business reasons.

98.    The timing and circumstances of Plaintiff's termination, occurring shortly after he raised concerns about discriminatory treatment in the employee engagement survey, establish a clear pattern of retaliation for his protected activity.

99.    The actions and inaction of Defendant, by and through the conduct of its employees, supervisors, managers, and agents, as more particularly described hereinabove, constitute unlawful retaliation.

100.    As his employer, Defendant was obligated to guard against the retaliation of Plaintiff by his co-workers, supervisors, managers, and other agents of Defendant and to protect Plaintiff from retaliation in the workplace.

101.    Defendant violated the ADA by, among other things, failing to promptly correct the retaliatory conduct toward Plaintiff once it learned of it.

102.    Plaintiff, by being subjected to this retaliation created by

Defendant, was unreasonably and negatively affected in the terms, conditions, or privileges of his employment with Defendant.

103. The conduct of Defendant, by and through its employees, supervisors, managers, and other agents, and Defendant's failure to exercise reasonable care to prevent and/or to take prompt and effective investigative and remedial action to prevent the retaliation of Plaintiff, deprived him of statutory rights under the ADA.

104. As a direct, proximate, and foreseeable result of Defendant's aforementioned actions and omissions, Plaintiff has suffered, continues to suffer, and will suffer the following: (a) lost wages and benefits, past and future; (b) lost earning capacity; (c) interruption of medically necessary psychiatric treatment; (d) inability to prepare for required bariatric surgery; and (e) noneconomic damages, including, but not limited to, pain and suffering, mental anguish, loss of dignity, loss of the capacity for the enjoyment of life, and irreparable damages to his family and relationships.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.  Grant judgment in favor of Plaintiff and declare that Defendant has violated the ADA. 42 U.S.C. § 12101 et seq., as amended, and its implementing Regulations by retaliating against Plaintiff for engaging in protected activity;

B.  Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the retaliation to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, pension and related benefits, and any other appropriate nondiscriminatory measures to overcome the effects of the retaliation he has endured;

C.  Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of his injuries and damages caused by Defendant's retaliatory conduct and actions pursuant to the ADA;

D.  Award Plaintiff all other damages available under the ADA, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under

the ADA, according to proof;

E.      Award Plaintiff pre- and post-judgment interest calculated at the prevailing rate, as provided by law;

F.      Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.      Grant such other and further relief as this Court may deem equitable, just, and proper.

## COUNT VI
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### Race Discrimination
### 42 U.S.C. § 2000e et seq.

105.   Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in each of the preceding Paragraphs 1 through 60 of this Complaint as though fully set forth herein.

106.   Plaintiff is a 40-year-old male of Palestinian descent who was raised in Venezuela.

107.   At all times material herein, Defendant employed Plaintiff and Defendant was an "employer" within the meaning of Title VII.

108.   At all times material herein, Defendant employed, and continues to employ, fifteen (15) or more employees for each working day in each of

twenty (20) or more calendar weeks in the current or preceding calendar year. As such, at all times material herein, Defendant was and is an "employer" within the meaning of Title VII. 42 U.S.C. § 2000e(b).

109.   Moreover, Defendant is a "person" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(a).

110. Plaintiff was subjected to unlawful discrimination by Defendant's management and supervisors based on his national origin, ethnicity, and Spanish-language heritage. Despite being bilingual and a native Spanish speaker, Plaintiff was denied requests for Spanish-language customer support and was prevented from pursuing major Hispanic brokerages and Spanish-speaking accounts, including but not limited to La Rosa. This disparate treatment limited Plaintiff's sales opportunities and professional advancement and reflects discriminatory animus toward Plaintiff's Spanish heritage and language-based identity.

111.   Defendant's management did not expressly state that Plaintiff was excluded from opportunities because of his appearance or accent. Instead, management justified its decisions by asserting that replacements and favored employees had demonstrated performance at MoxiWorks or other companies closely tied to leadership. Those individuals—including

James McCalvy and Kelly Muller, both white and without accents—were hired or promoted into senior roles and afforded immediate access to high-value opportunities. By contrast, Plaintiff, who is bilingual, speaks English with a Spanish accent, and possesses extensive real estate industry experience—including active production and hands-on knowledge of competing platforms such as Lofty, Lone Wolf, Real Satisfied, and Testimonial Tree—was denied comparable access and advancement despite his demonstrated ability to perform at a high level. This pattern of selection and exclusion supports a reasonable inference that Plaintiff's appearance, accent, and national origin were motivating factors in Defendant's adverse employment decisions supporting a reasonable inference that Plaintiff's accent, national origin, and ethnicity were motivating factors in Defendant's adverse employment decisions..

112.   Defendant systematically excluded Plaintiff from high-value lead rotations and brokerage opportunities that were given to newer hires who were white and had personal or business connections to Defendant's leadership.

113.   Plaintiff was denied access to essential tools and systems and provided delayed or limited enablement, while newer white employees—

particularly those with connections to MoxiWorks—were granted immediate, full access and preferential treatment.

114.   Throughout his employment, Plaintiff observed a clear pattern where employees from CEO Jim Crisera's former company, MoxiWorks, who were predominantly white, received preferential treatment, including immediate access to tools, senior titles upon hiring, and better lead distributions, while Plaintiff was systematically excluded from similar opportunities.

115.   Defendant's management engaged in a pattern of misattributing Plaintiff's sales performance in a manner that favored white employees and diminished Plaintiff's achievements. On or about June 30, Plaintiff closed seven deals and was positioned as a leading performer for the period. That same day—coinciding with the start of Defendant's Australian fiscal year and the announcement of James McCalvy and Kelly Muller as Senior Account Executives—an $18,000 deal was credited to Anthony Snitsman, despite the fact that the deal was worked and finalized by Tiana Baur and Steph Holtan. Mr. Snitsman was on vacation in Europe at the time and was unaware that the deal had been attributed to him. The reassignment of credit on June 30 operated to diminish Plaintiff's standing and performance

metrics at a critical reporting moment. Communications regarding this misattribution occurred on Defendant's internal Slack system, to which Plaintiff no longer has access.

116. When Plaintiff advocated for equal treatment and access to the same opportunities as his white colleagues, Defendant characterized his legitimate concerns as performance issues and used them as justification for adverse employment actions.

117. The discriminatory treatment Plaintiff experienced was part of a broader pattern of favoritism toward white employees with personal or business connections to leadership, while employees of Middle Eastern descent and Spanish-speaking heritage, like Plaintiff faced systematic exclusion and differential treatment.

118. Defendant knew or should have known of the race discrimination suffered by Plaintiff.

119. Defendant violated Title VII by failing to promptly correct the race discrimination experienced by Plaintiff.

120. The conduct of Defendant, by and through its employees, supervisors, managers, and agents, and Defendant's failure to exercise reasonable care to prevent and/or to take prompt and effective investigative

and remedial action to prevent the race discrimination of Plaintiff, deprived him of statutory rights under Title VII.

121.    Defendant's actions constitute race discrimination in violation of Title VII.

122.    As a direct, proximate and foreseeable result of Defendant's aforementioned actions, inactions, and violations of Title VII, Plaintiff has suffered, continues to suffer, and will suffer the following: (a) lost wages and benefits, past and future; (b) lost earning capacity; and (c) noneconomic damages, including, but not limited to, pain and suffering, mental anguish, emotional distress, humiliation, loss of dignity, loss of the capacity for the enjoyment of life, irreparable damages to his family and relationships, and other nonpecuniary losses and intangible injuries.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated Title VII of the Civil Rights Act, as amended, and its implementing Regulations, by discriminating against Plaintiff

based on his race;

B.    Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the race discrimination to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C.    Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of the damages caused by Defendant's race discrimination pursuant to Title VII;

D.    Award Plaintiff all other damages available under Title VII, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under Title VII, according to proof;

E.    Award Plaintiff pre- and post-judgment interest;

F.    Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.    Grant such other and further relief as this Court may deem

equitable, just, and proper.

## COUNT VII
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## National Origin Discrimination
## 42 U.S.C. § 2000e et seq.

123.   Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in each of the preceding Paragraphs 1 through 60 of this Complaint as though fully set forth herein.

124.   Plaintiff is a 40-year-old male of Palestinian descent who was raised in Venezuela. He is a native Spanish speaker who learned English at approximately age fifteen and speaks English with a Spanish accent.

125.   At all times material herein, Defendant employed Plaintiff and Defendant was an "employer" within the meaning of Title VII.

126.   Moreover, Defendant is a "person" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(a).

127.   Plaintiff was subjected to national origin discrimination at the hands of Defendant's management and supervisors who treated him differently because of his Venezuelan heritage and Spanish accent.

128.   From the beginning of his second tenure, Plaintiff experienced

differential treatment based on his national origin and accent. Defendant's management discouraged Plaintiff's participation in meetings and communications and expressed concern regarding his manner of speaking, while similarly situated employees without accents were not subjected to such treatment.

129.   Despite being bilingual and having extensive experience serving Spanish-speaking clients, Defendant systematically denied Plaintiff opportunities to leverage his language skills and excluded him from pursuing Spanish-speaking clients, instead directing such leads to "English speaking workers."

130.   Defendant's management did not expressly state that Plaintiff was excluded from opportunities because of his national origin or accent. However, management's explanations and conduct implied that Plaintiff was viewed as a poor "fit," including comments and decisions reflecting discomfort with Plaintiff's manner of speaking and communication style. Plaintiff was marginalized while others without accents were favored for visibility and advancement, and management expressed that Plaintiff "talked too much" and was not aligned with Defendant's preferred presentation. Individuals with knowledge of Defendant's internal decision-

making, including but not limited to Julie Tendler and Dave Earl, possess information regarding the reasons Plaintiff was excluded from opportunities and the role Plaintiff's accent and perceived differences played in those decisions. This pattern supports a reasonable inference that Plaintiff's national origin and accent were motivating factors in Defendant's adverse employment actions.

131. Although Defendant did not expressly state that Plaintiff was treated adversely because of his Venezuelan origin, management's conduct and explanations reflected discomfort with Plaintiff's accent, communication style, and background, and Plaintiff was treated as a poor "fit" as compared to employees without foreign accents.

132. The discriminatory treatment included systematic exclusion from high-value lead rotations, delayed or limited access to essential tools and systems, and exclusion from meetings and strategic discussions, while employees without foreign accents were provided full access to these opportunities.

133. Defendant's pattern of discrimination prevented Plaintiff from utilizing his bilingual skills and cultural competency that would have benefited the company's business objectives in serving diverse markets.

134.   When Plaintiff advocated for equal treatment and the right to serve Spanish-speaking clients, Defendant characterized his legitimate requests as performance issues and used them as justification for adverse employment actions.

135.   The national origin discrimination Plaintiff experienced was part of a broader pattern where employees with foreign accents and non-American backgrounds faced systematic exclusion while employees who fit a particular cultural and linguistic profile received preferential treatment.

136.   Defendant knew or should have known of the national origin discrimination suffered by Plaintiff.

137.   Defendant violated Title VII by failing to promptly correct the national origin discrimination experienced by Plaintiff.

138.   The conduct of Defendant, by and through its employees, supervisors, managers, and agents, and Defendant's failure to exercise reasonable care to prevent and/or to take prompt and effective investigative and remedial action to prevent the national origin discrimination of Plaintiff, deprived him of statutory rights under Title VII.

139.   Defendant's actions constitute national origin discrimination in violation of Title VII.

140.   As a direct, proximate and foreseeable result of Defendant's aforementioned actions, inactions, and violations of Title VII, Plaintiff has suffered, continues to suffer, and will suffer the following: (a) lost wages and benefits, past and future; (b) lost earning capacity; and (c) noneconomic damages, including, but not limited to, pain and suffering, mental anguish, emotional distress, humiliation, loss of dignity, loss of the capacity for the enjoyment of life, irreparable damages to his family and relationships, and other nonpecuniary losses and intangible injuries.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated Title VII of the Civil Rights Act, as amended, and its implementing Regulations, by discriminating against Plaintiff based on his national origin;

B.    Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the national origin discrimination to which Defendant subjected him, including, but

not limited to, front pay in lieu of reinstatement, full backpay with interest, and any other appropriate nondiscriminatory measures to overcome the effects of the discrimination he has endured;

C. Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of the damages caused by Defendant's national origin discrimination pursuant to Title VII;

D. Award Plaintiff all other damages available under Title VII, including, but not limited to, the damages set forth above and other economic losses proximately caused and allowable under Title VII, according to proof;

E. Award Plaintiff pre- and post-judgment interest;

F. Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G. Grant such other and further relief as this Court may deem equitable, just, and proper.

## COUNT VIII
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### Retaliation
### 42 U.S.C. § 2000e et seq.

141.   Plaintiff alleges, realleges, and incorporates by reference all allegations set forth in each of the preceding Paragraphs 1 through 60 of this Complaint as though fully set forth herein.

142.   Plaintiff is a 40-year-old male of Palestinian descent who was raised in Venezuela and learned English at approximately age fifteen, which contributes to his Spanish accent.

143.   At all times material herein, Defendant employed Plaintiff and Defendant was an "employer" within the meaning of Title VII.

144.   Moreover, Defendant is a "person" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(a).

145.   Plaintiff engaged in protected activity under Title VII by opposing discriminatory practices based on race and national origin, including requesting equal access to opportunities and expressing concerns about differential treatment he was receiving compared to employees who were not members of protected classes.

146.   Plaintiff engaged in protected activity by participating in the

June 3, 2025 employee engagement survey where he voiced concerns about the discriminatory treatment and lack of opportunities he was experiencing compared to his colleagues.

147.   Plaintiff further engaged in protected activity by repeatedly advocating for equal treatment and opposing the systematic exclusion he faced based on his race, national origin, and accent, which management viewed negatively and used against him.

148.   Defendant subjected Plaintiff to adverse employment actions in retaliation for his protected activities, including placing him on probation in April 2025 after he expressed frustration over the lack of support and differential treatment he was receiving.

149.   Following the June 2025 engagement survey where Plaintiff voiced concerns about discriminatory treatment, Defendant began micromanaging Plaintiff and subjecting him to increased scrutiny and different treatment compared to similarly situated employees.

150.   Defendant ultimately terminated Plaintiff's employment on July 8, 2025, shortly after he raised concerns about discriminatory treatment in the employee engagement survey, establishing a clear temporal connection between his protected activity and the adverse employment action.

151. The timing and circumstances of Plaintiff's termination, occurring just hours after he had successfully facilitated a HubSpot discovery session demonstrating his continued value to the company, establish that his termination was in retaliation for his protected activities rather than for legitimate business reasons.

152. Defendant's claimed reason for termination—that Plaintiff's position was "eliminated" due to company restructuring—was pretextual, as other employees in similar roles were retained or promoted while Plaintiff, who had engaged in protected activity, was singled out for termination.

153. The actions and inaction of Defendant, by and through the conduct of its employees, supervisors, managers, and agents, as more particularly described hereinabove, constitute unlawful retaliation under Title VII.

154. As his employer, Defendant was obligated to guard against the retaliation of Plaintiff by his co-workers, supervisors, managers, and other agents of Defendant and to protect Plaintiff from retaliation in the workplace.

155. Defendant violated Title VII by, among other things, failing to promptly correct the retaliatory conduct toward Plaintiff once it learned of

it.

156.  Plaintiff, by being subjected to this retaliation created by Defendant, was unreasonably and negatively affected in the terms, conditions, or privileges of his employment with Defendant.

157.  The conduct of Defendant, by and through its employees, supervisors, managers, and other agents, and Defendant's failure to exercise reasonable care to prevent and/or to take prompt and effective investigative and remedial action to prevent the retaliation of Plaintiff, deprived him of statutory rights under Title VII.

158.  As a direct, proximate, and foreseeable result of Defendant's aforementioned actions and omissions, Plaintiff has suffered, continues to suffer, and will suffer the following: (a) lost wages and benefits, past and future; (b) lost earning capacity; and (c) noneconomic damages, including, but not limited to, pain and suffering, mental anguish, loss of dignity, loss of the capacity for the enjoyment of life, and irreparable damages to his family and relationships.

**WHEREFORE**, the Plaintiff, GUSTAVO ABDELNOUR, requests trial by jury of all issues so triable as of right, demands judgment against the

Defendant, RATEMYAGENT, INC., and in favor of Plaintiff, and respectfully requests that this Court grant the following relief:

A.    Grant judgment in favor of Plaintiff and declare that Defendant has violated Title VII of the Civil Rights Act, as amended, and its implementing Regulations by retaliating against Plaintiff for engaging in protected activity;

B.    Award sufficient remedial relief to make Plaintiff whole for the individual loss that he has suffered because of the retaliation to which Defendant subjected him, including, but not limited to, front pay in lieu of reinstatement, full backpay with interest, and any other appropriate nondiscriminatory measures to overcome the effects of the retaliation he has endured;

C.    Award compensatory damages to Plaintiff in an amount that will fully, justly, and reasonably compensate Plaintiff for the nature, extent, and duration of the damages caused by Defendant's retaliatory conduct pursuant to Title VII;

D.    Award Plaintiff all other damages available under Title VII, including, but not limited to, the damages set forth above and

other economic losses proximately caused and allowable under Title VII, according to proof;

E.      Award Plaintiff pre- and post-judgment interest;

F.      Award Plaintiff his attorneys' fees, reasonable expert witness fees, and the costs of this action; and

G.      Grant such other and further relief as this Court may deem equitable, just, and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff respectfully requests a trial by jury.

Date this 23rd day of December 2025.

*/s/ Jason W. Imler, Esq*
Jason W. Imler
Florida Bar No. 1004422
Alberto "Tito" Gonzalez
Florida Bar No. 1037033
**Imler Law**
23110 State Road 54, Unit 407
Lutz, Florida 33549
(P): 813-553-7709
Jason@ImlerLaw.com
Tito@ImlerLaw.com
Ashley@ImlerLaw.com
Tiffany@ImlerLaw.com